**UNITED STATES FIRE INSURANCE COMPANY, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY, Aetna Casualty & Surety Company, John S. Bell, Jr. and Michael Bell, Defendants.**

**No. 85 Civ. 2014 (BN).**

United States District Court, S.D. New York.

Oct. 7, 1987.

Barry, McTiernan & Moore, New York City by Michael F. Close, for plaintiff U.S. Fire Ins. Co.

Shanley & Fisher, P.C., New York City by Robert M. Leonard, for defendants Federal Ins. Co., John S. Bell, Jr. and Michael Bell.

Leahey & Johnson, New York City by Edward Bosek, for defendant Aetna Cas. & Sur. Co.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge, United States Court of International Trade, sitting as a District Court Judge, by designation:

United States Fire Insurance Company ("U.S. Fire") commenced this action against two other insurers to recover the sum of $866,345 U.S. Fire contributed to the settlement of an underlying personal injury action brought against an insured of all three companies, resulting from an automobile accident more fully described *infra.*

Initially, plaintiff named as defendants Federal Insurance Company ("Federal"), John Bell[1], and his son, Michael. Thereafter, an amended summons and complaint were served to include Aetna Casualty & Surety Company ("Aetna") as a defendant.[2] In due course, trial was had to the court. Diversity jurisdiction is predicated on Title 28 U.S.C. § 1332.

Subsequent to trial and after negotiations, defendant Aetna agreed to contribute its primary policy limit amount—$500,000—in full settlement of all claims against it by Federal and U.S. Fire. Accordingly, this action is dismissed as to Aetna and the opinion herein discusses plaintiff's claims solely against Federal.

---

1. This defendant, alternately titled "John S. Bell, Jr." (summons and complaint), "John B. Bell, Jr." (joint pre-trial order), and "John Fitzhugh Bell" (tr. at 9), will hereinafter be referred to as "John Bell".

2. U.S. Fire is a New York corporation; Federal is a Connecticut corporation; John and Michael Bell, at the relevant time, were residents of Connecticut; and Aetna is a Connecticut corporation. Although named in this action, the Bells have been effectively removed from this litigation, which in essence, has proceeded against Federal and Aetna only.

## BACKGROUND

It has been stipulated that on August 24, 1981 Michael Bell, residing at 548 North Street, Greenwich, Connecticut, his lifelong domicile, was driving a 1979 Buick station wagon accompanied by a friend, David Spencer—a grandson of John D. Rockefeller, III. Spencer (the front seat passenger) and Bell (the driver) were the only two occupants of the vehicle which was owned by John Boyle & Company, Inc. ("the Boyle Company")[3] and which was regularly furnished to Michael Bell for his use.

Bell and Spencer had just departed the Rockefeller Estate in Pocantico Hills, Westchester County, New York and were driving approximately one-half mile away when their auto left the roadway and collided with a tree, in a single vehicle accident. Spencer, then 19, suffered severe injuries including, *inter alia*, a comminuted, compound fracture of the right leg with dislocation and complete disruption of the knee joint, and a comminuted fracture of the right wrist and hand. Spencer's leg injury eventuated in an amputation above the knee.

Thereafter, Spencer commenced a personal injury action in New York Supreme Court against Michael Bell and the Boyle Company—the operator and owner of the accident vehicle, respectively. The defense for both defendants was provided by Federal, the primary insurer of the Boyle Company vehicle. Ultimately, the lawsuit was settled in November 1984 for $1,366,345. Of that amount, Federal paid $500,000 under its Boyle Company primary policy and U.S. Fire paid the remaining $866,345 pursuant to its catastrophe policy, also issued to the Boyle Company. *See infra* at 1193–94.

In the instant litigation, whereas Aetna contended that the amount of the Spencer settlement was unreasonably high, both U.S. Fire and Federal argued the converse, *viz.*, that it was justifiably proper, particularly in view of David Spencer's youth (19); his projected additional life expectancy (approximately 52 years); the severity of his injuries (briefly described *supra*); and his socioeconomic standing (a Rockefeller family member).

At the close of trial, plaintiff moved for partial judgment on such issue of reasonableness and upon due consideration, its application was granted from the bench wherein the court determined that the Spencer personal injury settlement was reasonable.[4] Consequently and subsequent to trial, Aetna agreed to contribute its policy limit of $500,000 in full settlement of the respective claims against it.[5]

At the time of the Bell/Spencer automobile accident, the following relevant insurance policies were in effect:

1. A $500,000 business automobile policy issued by Federal to the Boyle Company.

2. A $500,000 personal underlying automobile policy issued by Aetna to Mary Bell (Michael's mother) insuring a 1979 BMW, which vehicle was not involved in the accident.

3. A $10,000,000 commercial comprehensive catastrophe liability policy is-

---

3. The record indicates that John Bell was president of the Boyle Company.

4. It should be noted that Aetna, like Federal, called no witnesses during the entire trial and chose instead to rely solely on its cross-examination of plaintiff's witness on this issue. In point of fact, Daniel R. Miller, a senior claims specialist at Crum & Forster (an insurance group of which plaintiff was part) was the only witness called to testify at trial. After observing his demeanor and evaluating his testimony, the court finds Miller to be highly credible.

5. The court also notes that a second issue concerning Aetna was raised at trial, *viz.*, whether Aetna's disclaimer of coverage under its primary personal automobile policy based on an exclusion therein was timely and effective. Aetna argued that Connecticut law should be applied, and that thereunder, its disclaimer was valid. U.S. Fire and Federal countered that New York law should govern, and accordingly, Aetna's disclaimer would then be rendered untimely. Since Aetna tendered the full amount of its policy, the court does not reach this issue. However, it is uncontested that New York law applies to resolve the instant excess liability dispute between U.S. Fire and Federal.

sued to the Boyle Company and two other companies by U.S. Fire.[6]

4. A $2,000,000 personal excess liability policy issued by Federal to John Bell.[7]

Federal assumed the defense of the Spencer lawsuit under its primary business auto policy, which covered the Boyle Company vehicle involved in the accident. As indicated, of the $1,366,345 settlement, Federal paid $500,000 under its primary policy and U.S. Fire contributed the balance of $866,345; after trial, Aetna contributed its primary policy limit of $500,000. Thus, U.S. Fire claims an outstanding amount of $366,345, contending that Federal's $2,000,000 excess liability policy should provide an initial level of excess coverage and should contribute before U.S. Fire's $10,000,000 catastrophe policy. In plaintiff's view, its policy provides coverage only *after* available excess (such as Federal's) and primary insurance has been exhausted. The short of the matter is: plaintiff insists that Federal's excess liability policy is "more specific to the accident, and therefore applies first."

In the alternative, U.S. Fire argues that both its and Federal's excess policies should be applied ratably in the ratio of their respective limit amounts, *viz.*, $10,-000,000: $2,000,000, *i.e.*, 10:2.

Conversely, "Federal admits its 'Personal Excess Policy' covers the accident, but contends U.S. Fire's 'Comprehensive Commercial Catastrophe Policy' applies first. Since the latter policy is not exhausted, Federal has no liability." Joint pre-trial order at 7.

For the reasons set forth *infra*, the court finds the U.S. Fire and Federal excess insurance policies to be indistinguishable for purposes of determining which should be deemed "more excess". Critical provisions and certain phraseology of plaintiff's catastrophe and defendant's excess liability policies are highly comparable and the subject insurance contracts operate to cancel each other out. Hence, the court applies the general rule and holds that the parties must contribute *pro rata* based on their respective limit amounts. Since U.S. Fire has paid the outstanding $366,345 to Spencer, Federal shall pay to plaintiff one-sixth (⅙) thereof, *viz.*, $61,057.50 (representing Federal's proportionate share), plus costs.

## DISCUSSION

### A.

A discussion of the instant controversy necessarily commences with a review and comparison of pertinent provisions of both insurance contracts in question.

THE U.S. FIRE POLICY

Plaintiff's policy is entitled "Commercial Comprehensive Catastrophe Liability Policy" and its general coverage provision states:

> The Company agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain ... for:
>
> (a) Personal Injury Liability

Exh. 1 at 1.

More specifically, the policy expressly applies

> with respect to an automobile owned by ... the named insured, [to] any person using the automobile with the named insured's permission, and any person or organization legally responsible for the use thereof.

*Id.* at 2.

Clearly, the accident is a covered event, *i.e.*, plaintiff's policy applies as Michael Bell was furnished with the regular use of the Boyle Company vehicle, in which David Spencer was injured.

"Ultimate net loss" is defined as:

**6.** The U.S. Fire catastrophe policy named the Boyle Company and Summit Filter Company, both of Summit, New Jersey, as insured. Two amendments to its declarations page listed an additional address in Manhattan for the Boyle Company and included another insured: Fibre Taxis, Inc. Further, $5,000,000 of this $10,000,-000 coverage was provided by the Home Insurance Company, but for purposes of this case, U.S. Fire and Home have been treated as a single entity.

**7.** All references herein to "the Federal policy" concern this excess liability policy and not the underlying Federal primary policy, unless otherwise indicated.

All sums which the insured, or any company as his insurer, or both, is legally obligated to pay as damages, whether by reason of adjudication or settlement, because of personal injury ... liability to which this policy applies....

This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance

*Id.* (boldface in original omitted).

"Underlying Insurance" is defined as follows:

If underlying insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

*Id.* at 4.

With respect to the "retained limit" of $10,000 above which U.S. Fire will pay the amount of ultimate net loss:

[T]he company's liability shall be only for the ultimate net loss in excess of ... the greater of:

(a) the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other insurance collectible by the insured; or

(b) an amount as stated in Item 4(C) of the declarations as the result of any one occurrence not covered by the said policies or insurance;

and then up to an amount not exceeding the amount as stated in Item 4(A) of the declarations as the result of any one occurrence.

*Id.* at 3.

Schedule A, appended to the U.S. Fire policy, lists various underlying coverage including $500,000 comprehensive automobile liability coverage. The declarations page dated "12/19/80" under section 4(A) "Limit of Liability" states a coverage amount of $5,000,000 for each occurrence and an additional $5,000,000 aggregate per annum limit "with respect to the products hazard", thereby comprising the subject $10,000,000 policy.

Finally, as to "other insurance":

If other collectible insurance including other insurance with this company is available to the insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder) the insurance hereunder shall be in excess of and not contribute with such other insurance.

*Id.* at 4.

THE FEDERAL POLICY

Federal issued to John Bell a $2,000,000 "Personal Excess Liability Policy" covering two residential properties, one vehicle and three licensed drivers, and by its terms was stated to be in excess of a combined single limit primary automobile liability policy of $500,000 and an underlying homeowner's insurance policy.

Federal's basic coverage responsibilities comprise:

A. Personal Liability: The company agrees to pay on behalf of the insured ultimate net loss, in excess of the retained limit, which the insured shall become legally obligated to pay as damages because of personal injury....

Exh. 3 at 6 (boldface in original omitted).

It is undisputed that the Federal policy defines an "insured" to include any relative who resides in the named insured's household. Coverage is applicable because Michael Bell resided in his father's household at the time of the accident and was operating an "owned automobile", *viz.*, the station wagon owned by the Boyle company, which vehicle was furnished for Michael's regular use. *See Id.* at 8–10.

"Ultimate net loss" is

the sum actually paid or payable in cash in the settlement or satisfaction of loss for which the insured is liable ... but excludes all loss expenses ... of the insured, the company or any primary insurer so incurred

*Id.* at 11 (boldface in original omitted).

Further, the Federal "retained limit" is

the limit of liability of the primary insurance as it is shown in the Schedule hereof, or the actual limits of liability of any applicable primary or other insurance, whichever is greater....

(*Id.* at 10) and its "other insurance" clause states

[t]he insurance provided by this policy shall be in excess of, and shall not contribute with, any other insurance (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder) available to the named insured or any other person or organization falling within the definition of insured in this policy, not only under any policy enumerated in the Schedule, but also under any other insurance available to the insured, and this insurance shall not apply until all such insurance is exhausted.

*Id.* at 15 (boldface in original omitted).

### B.

Establishing a "pecking order" [8] among multiple insurers covering the same risk is an

anomaly ... [which] arises from the fact that although the insurers contract not with each other but separately with one or more persons insured, each attempts by specific limitation upon the rights of its insured to distance itself further from the obligation to pay than have the others.

*State Farm Fire & Casualty Co. v. Li-Mauro*, 65 N.Y.2d 369, 372, 492 N.Y.S.2d 534, 537, 482 N.E.2d 13, 16 (1985).

█ Despite a variety of resolutions to the problem, in New York, a general rule has emerged that mutual excess policies covering the same risk cancel each other out (*Kansas City Fire and Marine Ins. Co. v. Hartford Ins. Group*, 57 N.Y.2d 920, 456 N.Y.S.2d 760, 442 N.E.2d 1271 (1982); *Federal Ins. Co. v. Atlantic Nat'l Ins. Co.*, 25 N.Y.2d 71, 302 N.Y.S.2d 769, 250 N.E.2d 193 (1969)); and further, each insurer is required to contribute ratably in such proportion as its policy limit bears to the total of all policy limits (*Lumbermens Mut. Cas-*

*ualty Co. v. Allstate Ins. Co.*, 51 N.Y.2d 651, 435 N.Y.S.2d 953, 417 N.E.2d 66 (1980); *State Farm, supra.*)

This so-called cancelling out rule is

inapplicable when its use would distort the meaning of the terms of the policies involved.... Whether there will be such a distortion turns on consideration of the purpose each policy was intended to serve as evidenced by both its stated coverage and the premium paid for it ... as well as upon the wording of its provision concerning excess insurance.

*State Farm*, 65 N.Y.2d at 374, 492 N.Y.S.2d at 538, 482 N.E.2d at 17 (citation omitted).

After noting that various courts had adjudicated the issue differently, the New York Court of Appeals in *State Farm* concluded:

The rule to be distilled from these cases is that an insurance policy which purports to be excess coverage but contemplates contribution with other excess policies or does not by the language used negate that possibility must contribute ratably with a similar policy, but must be exhausted before a policy which expressly negates contribution with other carriers, or otherwise manifests that it is intended to be excess over other excess policies.

*Id.* at 375–76, 492 N.Y.S.2d at 539, 482 N.E.2d at 18 (citations omitted).

The court in *State Farm* primarily considered, *inter alia*, two policies providing excess coverage: (1) an umbrella policy which insured multiple risks on an excess level but assumed no primary liability as to any of them, and further, explicitly provided that it "shall be in excess of, and shall not contribute with" other collectible insurance available to the insured covering a loss "covered hereunder"; and (2) a primary automobile liability policy which stated that coverage would be rendered "excess" if the injury-causing vehicle was not owned by the insured. The non-owned vehicle clause converted such policy from primary to excess in this instance. *Id.* at

---

**8.** "Pecking order" refers to the establishment of a hierarchy or priority of payment.

376–77, 492 N.Y.S.2d at 539–40, 482 N.E.2d at 18–19.

The court departed from the general rule of proration and held that the umbrella policy, being a true excess policy, was not required to contribute until the limits of the automobile policy had been exhausted. Although both policies were found to insure the same risk, "they covered it at different levels", especially in view of the purposes for which the policies were issued: "[one] being essentially primary coverage for a specific automobile with *incidental* excess coverage for a non-owned automobile, [and the other] providing *only* excess coverage for a number of different liability-causing situations." *Id.* at 378, 492 N.Y.S.2d at 541, 482 N.E.2d at 20 (emphasis added).

The present case is patently distinguishable. Here, with respect to basic coverage for personal injury liability, each policy states that payment is forthcoming on behalf of an insured for the ultimate net loss in excess of the retained limit. *See* exh. 1 at 1, exh. 3 at 6. "Ultimate net loss" is, in both instances, defined as the amount paid or payable by the insured pursuant to legal obligation.

■ Moreover, both insurers contract to pay the amount of ultimate net loss in excess of the "retained limit", which as noted, U.S. Fire defines as the total of the applicable limits of underlying policies listed in Schedule A and the applicable limits of any other insurance collectible by the insured. Exh. 1 at 3. In comparison, Federal is responsible for the limit of primary insurance listed in the policy's appended schedule or the actual limits of any applicable primary or other insurance, whichever is greater. Exh. 3 at 10. Neither company's "schedule" lists the other's excess policy as underlying coverage and the respective wording utilized in the two insurance contracts is essentially duplicative and subject to identical interpretation. Plainly, both companies are attempting to insure at an excess level only, *i.e.*, above primary and other coverage. In summary, upon thorough review of the policies, the court holds that neither is to be given precedence over the other.

Plaintiff highlights a portion of defendant's policy which states that Federal's excess liability responsibilities commence "after all *primary* liability insurance … has been used up" to indicate that Federal intended to provide a mere initial layer of excess coverage. Manifestly, this language is contained in a general, introductory provision of the Federal insurance contract, within a subsection entitled "Your Policy and You". Exh. 3 at 3–4. Significantly, defendant's precise coverage responsibilities are more elaborately and technically set forth in the "Policy" section (*Id.* at 5–15) which discloses a consistent intention on the part of Federal to contribute policy proceeds only after primary *and* other insurance has been exhausted. Similarly, the U.S. Fire policy contemplates that both primary and excess coverage must be exhausted before its policy is called upon to contribute.

Defendant cites *Lumbermens* (51 N.Y.2d 651, 435 N.Y.S.2d 953, 417 N.E.2d 66) in arguing that under appropriate circumstances, such as here, the general rule of proration should be rejected because it would distort the plain meaning of the policies involved. Federal maintains that its policy is obviously more excess than plaintiff's because it was purchased by John Bell "to provide him with a measure of comfort against large liabilities over and above his several underlying coverages" and as "the final tier in Mr. Bell's insurance plan … [since] Mr. Bell did not bargain for coverage that would contribute with other policies, but rather for coverage above and beyond any other available insurance." Deft's brief at 9–10.

In *Lumbermens*, the New York Court of Appeals established a pecking order among four conflicting policies in this manner:

(1) a primary automobile policy;

(2) a primary policy converted into an excess policy under a non-owned vehicle contingency clause;

(3) an executive (excess) policy; and

(4) a catastrophe (umbrella) policy.

Continuing, *Lumbermens* held the general rule to be inapplicable "because its use would effectively deny and clearly distort

the plain meaning of the terms of the policies of insurance here involved." *Id.* at 655, 435 N.Y.S.2d at 955, 417 N.E.2d at 68. The court determined that the executive policy should contribute before the catastrophe policy, finding that the latter specifically provided coverage in excess of all other coverage available, including excess coverage. Conversely, the court ruled that executive policy was "not just a simple excess policy, but was designed specifically to provide coverage in excess of that provided by [the primary-turned-excess] policy" and would contribute once that underlying policy had been exhausted. *Id.* Although arguably, the *Lumbermens'* executive and catastrophe policies parallel the Federal and U.S. Fire policies, respectively, the current situation is readily distinguishable.

As plaintiff correctly points up, "the two policies contain virtually identical 'other insurance' clauses." Pltf's brief at 5. The U.S. Fire policy expressly states that if other collectible insurance is available to the insured, the U.S. Fire coverage shall be in excess of and not contribute with such other insurance. Exh. 1 at 4. Comparing the analogous Federal provision, it is evident that defendant's insurance is deemed excess to and shall not contribute with any other insurance available to the insured until all such insurance is exhausted. Exh. 3 at 15. Undeniably, both carriers contemplate a disbursement only at the highest (*i.e.* last) level of coverage and have attempted, by way of their similar phraseology, to render their coverage excess to all others. Here too, as to "other insurance", the court finds no significant distinctions between the U.S. Fire and Federal policies.

Importantly, too, the evidence is uncontroverted that neither "other insurance" clause contains language specifically making its carrier, *i.e.,* plaintiff or defendant, excess over *all other excess* insurers covering the same risk. In addition, neither U.S. Fire's nor Federal's insurance contract contains language whose plain meaning would be distorted by the application of the general rule requiring proration. As the U.S. Fire and Federal insuring agreements mirror one another in many critical instances,

the court cannot deem one "more excess" than the other; rather, *the policies operate to cancel each other out.* Both, therefore, must contribute toward the Spencer settlement at the same level of excess coverage, *i.e.,* ratably. *Kansas City Fire and Marine Ins. Co. v. Hartford Ins. Group,* 57 N.Y.2d 920, 922–23, 456 N.Y.S.2d 760, 761, 442 N.E.2d 1271, 1272 (1982).

### C.

An additional consideration often taken into account by the courts has been the premium paid for each policy in that an insurer charging a significantly lower premium for its excess coverage does so to contract for a correspondingly low level of risk, *i.e.,* the lower the premium, the lower the risk to the insurance company, and the higher in the ultimate hierarchy of payment. *See State Farm,* 65 N.Y.2d at 374, 492 N.Y.S.2d at 538, 482 N.E.2d at 17; *Lumbermens,* 51 N.Y.2d at 656–57, 435 N.Y.S.2d at 955–56, 417 N.E.2d at 68–69. In our situation, the U.S. Fire premium for $10,000,000 coverage was $7,500 annually. In contrast, the Federal premium for $2,000,000 coverage was $144 per annum. It was quite correctly pointed out, however, that U.S. Fire insured three corporations and provided for a variety of coverage including, *inter alia,* workmen's compensation, comprehensive general liability, advertising liability and products liability. The Federal excess policy covered two residential properties, one automobile and three licensed drivers. Such different coverage makes premium comparisons irrelevant, and in our case, the wide disparity does not reflect an intention to contract at a different rate of risk, but rather, is the result of the substantial differences in coverage. *Northbrook Excess & Surplus Ins. Co. v. Chubb Group of Ins. Cos.,* 67 N.Y.2d 1015, 503 N.Y.S.2d 317, 494 N.E.2d 448, (1986), *aff'g,* 113 A.D.2d 319, 496 N.Y. S.2d 430 (1st Dep't 1985) (final tier of coverage carried an unusually substantial premium of $1,062,500 for $10,000,000 of insurance).

Finally, even if the U.S. Fire contract could be interpreted as providing somewhat

narrower coverage, both insurers are liable because they each provided excess coverage for the loss at issue. Any difference in specificity is insufficient to warrant a finding that one policy should be deemed excess to the other. *See Atlantic Mut. Ins. Co. v. Truck Ins. Exchange,* 797 F.2d 1288 (5th Cir.1986).

### CONCLUSION

After a thorough review of the record, including forty-one exhibits, and particularly of course, the two insurance policies at issue, the court finds no substantial differences between these policies concerning critical coverage provisions. There is no difference in specificity between the two insuring agreements. Indeed, their wording is similar in many instances, and in some, virtually identical. Hence, neither can be deemed excess to the other.

Accordingly, the court applies the general rule and orders U.S. Fire and Federal to contribute *pro rata* in the ratio of their policy limits, *i.e.,* $10,000,000 (U.S. Fire): $2,000,000 (Federal) or 10:2. U.S. Fire is therefore liable for five-sixths (⅚) of the $366,345 portion of the Spencer settlement while Federal is responsible for one-sixth (⅙), $61,057.50. Defendant Federal is directed to pay to plaintiff the sum of $61,-057.50, representing one-sixth of the amount plaintiff seeks, plus costs.

■ Plaintiff has not sufficiently demonstrated to the court its entitlement to prejudgment interest (*see* N.Y.Civ.Prac.L. & R. § 5001 *et seq.* (McKinney 1963 and Supplementary Pamphlet 1987); *see also, e.g., LaBuda v. New York,* 86 App.Div.2d 692, 446 N.Y.S.2d 534 (3rd Dep't 1982)) nor the proper date from which to begin calculating such amount. Consequently, the parties are to exchange legal memoranda concerning this issue and shall furnish the court with copies within ten (10) days of the date hereof. In any event, the sum due plaintiff shall bear interest *subsequent* to the date of entry of final judgment at the rate prescribed by 28 U.S.C. § 1961. *See G.M. Brod & Co., Inc. v. U.S. Home Corp.,* 759 F.2d 1526, 1542 (11th Cir.1985); *Weitz*

*Co., Inc. v. Mo–Kan Carpet, Inc.,* 723 F.2d 1382, 1385–87 (8th Cir.1983).

The foregoing constitutes the court's findings of fact and conclusions of law in conformance with Rule 52(a), Fed.R.Civ.P.

So ordered.